## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

REGINALD V. WILSON,           )
                                    )
     Plaintiff,             )
                                    )
v.                              )     Case No. CIV-24-539-D
                                    )
SGT. KEEGAN BURRIS, in his     )
Individual Capacity,          )
                                    )
     Defendant.           )

## ORDER

Before the Court is Defendant Sgt. Keegan Burris's Motion for Summary Judgment and Brief in Support [Doc. No. 47]. Plaintiff Reginald V. Wilson filed a response [Doc. No. 53], and Sgt. Burris replied [Doc. No. 54]. The matter is fully briefed and at issue.

## INTRODUCTION

Plaintiff initiated this action against Sgt. Burris of the Oklahoma City Police Department (OCPD), under 42 U.S.C. § 1983. Plaintiff alleges his constitutional rights were violated when Sgt. Burris deployed his K-9 partner, Edge, during a search of a neighborhood. Sgt. Burris had responded to the neighborhood at approximately 4:00 a.m. after reports of a burglary, with one burglary victim telling police that four males on bicycles were breaking into cars in the neighborhood. When OCPD arrived on the scene, Plaintiff ran and hid in an area with thick, tall grass and bushes. While on Sgt. Burris's leash, Edge discovered Plaintiff in his hiding spot, biting and injuring Plaintiff's calf.

In this action, Plaintiff alleges that Sgt. Burris used excessive force and unlawfully seized him, in violation of Plaintiff's Fourth Amendment rights. Plaintiff sues Sgt. Burris

1

in his individual capacity only. In the present motion, Sgt. Burris moves for summary judgment, claiming he is entitled to qualified immunity for Plaintiff's excessive force and unlawful seizure claims. Sgt. Burris also contends that he did not use excessive force on Plaintiff or unlawfully seize him.

### UNDISPUTED MATERIAL FACTS[1]

On July 20, 2023, at approximately 3:40 a.m., OCPD officer Justin Jarrett responded to a call that four black males were attempting to break into vehicles in the area near 1316 NW 113th Street in Oklahoma City. As Officer Jarrett approached the location, he "saw three black males on bicycles and one black male on foot next to a white SUV that was parked in the driveway." One of the four individuals yelled "Police!" and all four individuals fled. [Def.'s UMF Nos. 1-3; Pl.'s Resp. to Def.'s UMF Nos. 1-3].

Officer Jarrett lost sight of the individuals after attempting to go around a corner and cut them off. He spoke with the SUV's owner who reported that his car had been burglarized and that ten dollars had been stolen from the center console. [Def.'s UMF Nos. 3-4; Pl.'s Resp. to Def.'s UMF Nos. 3-4].

---

[1] For several of Defendant's undisputed material facts, Plaintiff does not specifically controvert them. For instance, Defendant's UMF No. 5 describes home security footage showing "one male entering the SUV" and "[t]he same four individuals return[ing] to the SUV a few minutes later." In response, Plaintiff "denie[s] to the extent Plaintiff denied he was either of the juveniles entering the SUV," which UMF No. 5 does not allege. Defendant's UMF No. 9 explains that Plaintiff hid for ten to twenty minutes while police and a helicopter searched the area, and that Plaintiff could see the police searching with their flashlights, could see the police cars, and could hear them getting closer to him but did not come out from his hiding spot. In response, Plaintiff denies because "Plaintiff testified he did not know a police dog was present and did not hear any warning that he may be bitten if he did not come out," which again does not controvert the facts presented in Defendant's UMF No. 9.

Home security footage of the burglary shows one male entering the SUV while the other three individuals ride bicycles on the street and in the neighboring driveway. One male takes what appears to be cash from the center console, then rides his bicycle to join the group on the street. The four individuals ride away from the SUV, returning a few minutes later. The same individual enters the SUV again, looking in and around the center console while the other three individuals ride bicycles in the street. At this time, one of the individuals yells "Police!" and all four individuals run or bike away from the approaching patrol car. [Def.'s UMF No. 5; Pl.'s Resp. to Def.'s UMF No. 5; Def.'s Ex. 2].

Security footage from a second home shows four individuals in a driveway with three parked vehicles. Two of the individuals attempt and eventually enter one of the parked vehicles while the other two individuals ride their bicycles in and around the driveway. Plaintiff denies that he was one of the individuals entering the vehicles, but he does admit that he is one of the four individuals riding a bicycle in the home security videos. [Def.'s UMF Nos. 6-7; Pl.'s Resp. to UMF Nos. 6-7; Def.'s Ex. 3].

When Plaintiff saw the police car approach with lights on, Plaintiff got off of his bicycle and started running away. He ran towards a pond and hid, standing in a narrow spot behind a bush for ten to twenty minutes while the police and a helicopter were searching the area. At his deposition, Plaintiff testified that he could see the police searching with their flashlights, could see the police cars, and could hear the police getting close to him but did not come out from his hiding spot. Plaintiff also testified that he did not know that a K-9 unit was participating in the search and did not hear any warnings that a K-9 was on scene. [Def.'s UMF No. 9; Pl.'s Resp. to UMF No. 9].

Just after 4:00 a.m., Sgt. Burris and Edge were dispatched to assist in the search for four individuals breaking into vehicles. Sgt. Burris was advised that felony third degree burglary had been committed and that the suspects had run from the area. He was given a brief description of the suspects and their direction of travel. [Def.'s UMF Nos. 12-13; Pl.'s Resp. to Def.'s UMF Nos. 12-13].

Sgt. Burris "was aware of automobile burglaries during this time period committed in the relative area that this crime occurred perpetrated with the sole intention of stealing handguns to resell on social media." [Def.'s UMF No. 14]. Accordingly, "when [Sgt.] Burris commenced the search he considered that the suspects were potentially armed." *Id.* In Plaintiff's response to UMF No. 14, he contends that Sgt. Burris "cannot use being present in an area prone to violence as basis for the belief that Plaintiff was potentially armed," and that "no one reported that a firearm had been stolen or that the suspects were armed." [Pl.'s Resp. to Def.'s UMF No. 14].

Plaintiff "knew they were looking for him and the other individuals he had been with but he stayed hidden because he thought the police might not be able to find him." [Def.'s UMF No. 10; Pl.'s Resp. to UMF No. 10; Doc. No. 47-4, at 7].[2]

Sgt. Burris testified that he believed his K-9 unit was the "best option" due to high grass in the area and because a helicopter on scene "[w]as not able to locate [them]." [Def.'s UMF No. 16; Doc. No. 47-5, at 21]. In response to Defendant's UMF No. 16, Plaintiff cites

---

[2] In response to Defendant's UMF No. 10, Plaintiff denies "as to the extent that Plaintiff did not hear warning that he may be bitten by a police dog if he does not make himself known," which does not refute the information provided in UMF No. 10.

to the OCPD Operations Manual, which provides that a K-9 unit handler shall not allow his dog to engage "when the size, age, and physical capabilities of the offender are such that use of the canine would be inappropriate." [Pl.'s Resp. to Def.'s UMF No. 16]. Sgt. Burris asserts that he "was not aware of Plaintiff's size, age, and physical capabilities when the dog was deployed." [Def.'s Reply to Pl.'s Resp. to Def.'s UMF No. 16].

Sgt. Burris and Edge had completed a 14-week training program together, and Edge was trained to locate and apprehend criminal suspects. Edge was trained that "when he comes into contact with the suspect he is searching for, he will bite and then immediately release the bite upon command." [Def.'s UMF Nos. 17-18; Pl.'s Resp. to Def.'s UMF Nos. 17-18]. Sgt. Burris was trained to give the release command to his K-9 unit "once the suspect is in a position where [Sgt.] Burris can see the person's hands." [Def.'s UMF No. 19; Pl.'s Resp. to Def.'s UMF No. 19].

When Sgt. Burris and Edge arrived on the scene, Sgt. Burris's body camera footage confirms that he gave two verbal warnings prior to beginning the search. Specifically, Sgt. Burris twice shouted, "Oklahoma City Police K-9 unit, come out or I'll release a dog, you may get bit." Plaintiff denies hearing either of these warnings, and Plaintiff notes that the first two warnings were given approximately 330 meters from the location where Plaintiff was ultimately found. [Def.'s UMF No. 22; Pl.'s Resp. to Def.'s UMF No. 22; Def.'s Ex. 7].

After the two warnings, Sgt. Burris began a search of the area for the four suspects with Edge on a 6-foot leash. Officer Blood accompanied them as a backup officer. As they began to search the area near a retention pond, Sgt. Burris made a third announcement about the use of his K-9 unit, shouting "Police K-9 unit – come to my voice … make

yourself known." [Def.'s Ex. 7]. Sgt. Burris testified that he made the announcement at that location because the helicopter had located a heat signature there and because Edge had a slight change in behavior indicating he was picking up an odor of some kind. Plaintiff asserts that the third announcement was made approximately 60 meters away "in a heavily weeded area facing the opposite direction" from Plaintiff's hiding spot, and Plaintiff did not hear the third warning. [Def.'s UMF Nos. 24-25; Pl.'s Resp. to Def.'s UMF Nos. 24-25; Def.'s Ex. 7].

Sgt. Burris testified that if he had "believed a suspect was hiding [where Plaintiff was found], he would have made another K-9 warning announcement and given the suspect another opportunity to surrender." [Def.'s UMF No. 27]. In response, Plaintiff asserts that Sgt. Burris "should have been giving announcements in all new areas searched to make Plaintiff aware of police dog presence and the risk of being bitten." [Pl.'s Resp. to Def.'s UMF No. 27].

As Sgt. Burris turned the corner into Plaintiff's hiding spot, Edge bit and held onto Plaintiff's leg. Plaintiff did not do anything to make his presence known to the officers prior to Edge discovering him. Plaintiff does not dispute that Edge "did not give [Sgt.] Burris any indication that he had located a suspect until he bit Plaintiff on the leg," that "[t]he helicopter did not pick up a heat signature at Plaintiff's hiding spot," or that "[t]he first indication [Sgt.] Burris had that Edge had located Plaintiff was when [Sgt. Burris] heard [Plaintiff] screaming." [Def.'s UMF Nos. 29-30; Pl.'s Resp. to Def.'s UMF Nos. 29-30].

When Sgt. Burris heard Plaintiff scream, he ordered Plaintiff to "let me see your hands" and to "slide out, slide out, slide!" [Def.'s UMF No. 31; Pl.'s Resp. to Def.'s UMF No. 31; Def.'s Ex. 7]. Sgt. Burris then instructed Officer Blood to "come on in" to the tight area and to "slide in and get his hands and I can get the dog off." Def.'s Ex. 7. Sgt. Burris can also be heard telling Plaintiff "hey – don't hit my dog." *Id.* Although Sgt. Burris contends that "Plaintiff began actively kicking the dog's head and took a swing at either [Sgt.] Burris or Edge while [Sgt.] Burris was removing the dog," Plaintiff describes his movements as "reflexive reactions while the police dog was clamped down and thrashing [his] leg." [Def.'s UMF No. 32; Pl.'s Resp. to UMF No. 32]. Plaintiff testified that he did not try to hit the dog or Sgt. Burris. *Id.*

Sgt. Burris testified that due to the darkness, the tight area with high grasses, and Plaintiff's movements (that Plaintiff describes as reflexive reactions), gaining control of Plaintiff's hands prolonged the time Edge held onto Plaintiff. Sgt. Burris testified that, given the circumstances, it would not have been safe to instruct Edge to release Plaintiff until Plaintiff's hands were contained. The body camera footage reflects that Officer Blood gained control of one of Plaintiff's arms approximately ten seconds before Sgt. Burris ordered Edge to release Plaintiff's leg. [Def.'s UMF Nos. 33-34; Pl.'s Resp. to Def.'s UMF Nos. 33-34; Def.'s Ex. 7, 8]. After Sgt. Burris ordered Edge to release, Officer Blood handcuffed Plaintiff. [Def.'s Ex. 7, 8].

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

7

FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## 42 U.S.C. § 1983

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## Qualified Immunity – Summary Judgment Standard

A public official sued under § 1983 in their individual capacity may invoke the defense of qualified immunity. *Ellis v. Salt Lake City Corp.*, 147 F.4th 1206, 1219 (10th Cir. 2025). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established" at the time of the challenged conduct. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). The court "can decide which prong to address first, and need not address both." *Dahn v. Amedei*, 867 F.3d 1178, 1185 (10th Cir. 2017).

In the qualified-immunity context, "[i]n determining whether the plaintiff has met [his] burden of establishing a constitutional violation that was clearly established, [courts] construe the facts in the light most favorable to the plaintiff as the nonmoving party." *Thomson*, 584 F.3d at 1312. "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record." *Id.*[3]

"To be clearly established, ordinarily there must be prior Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, that would have put an objective officer in [defendant]'s position on notice that he was violating [plaintiff]'s Fourth Amendment rights." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1171 (10th Cir. 2021) (quotations and citation omitted). Although there need not be a case "directly on point," the existing precedent must "place[] the unconstitutionality of the alleged conduct beyond debate." *Id.* (quotations and citation omitted). In analyzing this question, courts may not "define clearly established law at a high level of generality," which directive is

---

[3] As clarified by Judge Holmes in his concurrence, in addressing the *legal* issue of qualified immunity in the context of summary judgment,

> … the principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact is different than it is in the traditional summary judgment analytic paradigm. Specifically, contrary to the latter, the objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court.

*Thomson*, 584 F.3d at 1325 (Holmes, J., concurring).

9

"particularly important in excessive force cases." *Id.* (citing *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)).

## DISCUSSION

### I.      Excessive Force

#### a.      Constitutional Violation

The Fourth Amendment protects individuals against excessive use of force by officers, whose conduct is judged for its "objective reasonableness." For a plaintiff to establish an excessive force claim, he must show "both that a seizure occurred and that the seizure was unreasonable." *Luethje v. Kyle*, 131 F.4th 1179, 1196 (10th Cir. 2025). Courts utilize the following three factors found in *Graham v. Connor*, 490 U.S. 386 (1989), to determine whether a seizure was unreasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Luethje*, 131 F.4th at 1196 (citing *Graham*, 490 U.S. at 396). This analysis requires a court to look at the "facts and circumstances as they existed at the moment force was used, while also taking into consideration the events leading up to that moment." *Id.* The inquiry "considers the totality of the circumstances and is 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Vette*, 989 F.3d at 1169).

Applying the *Graham* factors and considering the totality of the circumstances, the Court agrees with Sgt. Burris that the first factor—the severity of the crime at issue—favors Sgt. Burris. In this case, it is undisputed that Sgt. Burris arrived at the scene to search for

four individuals suspected of breaking into vehicles in a residential neighborhood, which Plaintiff concedes is a felony. [Doc. No. 53, at 13]. Plaintiff's description of the crime as a "nonviolent property offense with no confrontation and no indication of weapons" does not change the fact that officers arriving to the scene were searching for four individuals suspected of the felony crime of burglary. *See Vette*, 989 F.3d at 1170 ("[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent.").

The second factor concerns whether the suspect posed an immediate threat to the safety of the officers or others. Plaintiff suggests that he did not pose an immediate threat to the officers when they decided to deploy a "bite-and-hold" police K-9 to search for the four burglary suspects. However, viewing the totality of the circumstances from the perspective of a reasonable officer on the scene, the Court finds that Sgt. Burris's use of his K-9 partner in the search was not objectively unreasonable. First, Sgt. Burris arrived on the scene where four individuals had fled after reports that vehicles were being burglarized, at approximately 4:00 a.m. As reflected in the officers' body camera footage, it was very dark, the officers were searching for burglary suspects in the middle of a residential neighborhood with gated backyards and drainage areas with tall grasses, and a helicopter had been unable to locate any of the burglary suspects. [Def.'s Ex. 7, 8]. Sgt. Burris also testified that given the recent car burglaries where suspects were searching for handguns to sell on social media, he anticipated that the burglary suspects may be armed. [Doc. No. 47-5, at 19-20]. Further, Plaintiff's repeated attempts to couch himself as nonthreatening because he "was concealed and stationary behind a bush" and did not end up being armed

11

would require the Court to view the circumstances with 20/20 hindsight, which the Court declines to do.[4] *Luethje*, 131 F.4th at 1196.

The third *Graham* factor considers whether the suspect is actively resisting arrest or attempting to evade arrest by flight. It is undisputed that Plaintiff was evading arrest by hiding from the police, and that Plaintiff knew that the police were looking for him. [Doc. No. 47-4, at 7]. Plaintiff also testified that he could hear the police as they came closer to his hiding spot, but he did not make himself known to the police until Edge bit Plaintiff in the high grasses of Plaintiff's hiding spot. *Id.* at 6. Plaintiff also testified that he understood that the police were looking for him and the other three individuals, and Plaintiff answered "yes" when asked whether he thought he was "going to be able to hide and [the police] might not find [him]." *Id.* at 7. Accordingly, at the time that Sgt. Burris utilized his bite-and-hold K-9 unit in the search for Plaintiff and the other three individuals, the Court finds that Plaintiff was actively attempting to evade arrest by flight.[5]

---

[4] The Court further disagrees with Plaintiff that Sgt. Burris's belief that the suspects may be armed was unreasonable or overly generic. Sgt. Burris testified that his decision to use his K-9 unit was based in part on his knowledge of individuals in the area recently breaking into cars for the specific purpose of stealing handguns to resell on social media. [Doc. No. 47-5, at 19-20]. The Court finds Sgt. Burris's belief to be reasonably based on specific, recent events, and not based on a mere high-crime area or other generic circumstance.

[5] The body camera footage does reflect that Plaintiff did not attempt to flee once Edge bit Plaintiff's leg, immobilizing him. However, viewing the totality of the circumstances—to include the tight space with tall grasses in which the officers were attempting to secure Plaintiff's hands in the dark—the Court finds that Plaintiff has not established that his constitutional rights were violated in the time between the K-9 unit initiating a bite and Sgt. Burris's release word.

Upon consideration of the *Graham* factors, and viewing the totality of the circumstances, the Court finds that Plaintiff has not established a violation of a constitutional right as needed to overcome Sgt. Burris's invocation of qualified immunity.

**b.      Clearly Established**

Plaintiff contends that "it is clearly established that a reasonable officer would have understood that deploying and maintaining a bite on [a] non-violent, non-armed, and non-threatening juvenile suspect violated the Fourt[h] Amendment." [Doc. No. 53, at 25]. "Law is clearly established 'if a plaintiff (1) identifies an on-point Supreme Court or published Tenth Circuit decision or (2) shows the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains.'" *Waterhouse v. Direzza*, 129 F.4th 1212, 1225 (10th Cir. 2025) (quoting *Flores v. Henderson*, 101 F.4th 1185, 1197 (10th Cir. 2024)). "In the rare obvious case, though, 'the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Jordan v. Jenkins*, 73 F.4th 1162, 1168 (10th Cir. 2023) (citation omitted).

Plaintiff first cites to *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154 (10th Cir. 2021). In that case, a police officer attempted to pull Mr. Vette over on a public road. *Vette*, 989 F.3d at 1159. With the officer in pursuit, Mr. Vette drove away, into a field, and then fled on foot. *Id.* In the field, the pursuing officer and another officer apprehended Mr. Vette. *Id. After* Mr. Vette was apprehended by the two officers, a third officer (with his K-9 unit) repeatedly punched Mr. Vette, hit him in the face with a dog chain, and deployed the K-9 unit to attack Mr. Vette. *Id.* Mr. Vette was charged with vehicle eluding, identity theft, and various misdemeanors. *Id.* at 1160. In *Vette*, the Tenth Circuit concluded that "punching an

13

arrestee, hitting him in the face with a dog chain, and allowing a police dog to attack him, all after he is subdued, violates the Fourth Amendment," and that the unconstitutionality of the conduct was clearly established. *Id.* at 1172-73.

Plaintiff also cites to *Luethje v. Kyle*, 131 F.4th 1179 (10th Cir. 2025), in which the Tenth Circuit analyzed a district court's denial of qualified immunity in the context of a motion to dismiss. In *Luethje*, Mr. Luethje alleged that his neighbor had called the police to report a male breaking the front window of Mr. Luethje's home, but the neighbor "could not provide a description of the male." *Luethje*, 131 F.4th at 1185. Several sheriff's deputies with long rifles were dispatched to the home, as well as deputy Travis Kyle, with his K-9 unit. *Id.* The officers approached the broken window and noticed the screen was still in place. *Id.* One of the deputies "removed the screen and knocked out the rest of the glass to enable Mr. Kyle to 'put his canine through the window.'" *Id.* "Mr. Kyle ordered [his K-9 unit] to 'find and bite whomever it found inside the residence, regardless of whether the person(s) were lawfully at the residence and regardless of whether the canine found a child or adult.'" *Id*. Mr. Luethje further alleged that the K-9 unit was "sent into the home unsupervised" and the "deputies apparently did not knock or announce themselves before [the K-9 unit] was let into the house." *Id.*

The K-9 unit found Mr. Luethje sleeping in his bed and "'immediately started biting Mr. Luethje in the hands, abdomen, and arm.'" *Id.* "From outside the home, having heard Mr. Luethje scream, Mr. Kyle yelled 'bring my dog to me!'" *Id.* Mr. Kyle and another deputy then entered the residence and "quickly located Mr. Luethje in the bedroom," with the K-9 unit latched onto his arm as he screamed "I live here! I live here!" *Id.* at 1186. "The

14

deputies watched [the K-9 unit] 'jerking and pulling on Mr. Luethje's left arm while biting him,'" but instead of removing the K-9 unit, "Mr. Kyle proceeded to question Mr. Luethje, asking if anyone else was inside and who broke the front window." *Id*. "During this questioning, [the K-9 unit] continued to 'clamp down' on Mr. Luethje's arm for 'approximately one minute' until Mr. Kyle finally removed [the K-9 unit] from Mr. Luethje's arm." *Id*.

Although Plaintiff cites to *Vette* and *Luethje*, neither case places the purported unconstitutionality of Sgt. Burris's alleged conduct beyond debate. In *Vette*, the plaintiff had already been apprehended by two officers when a third officer repeatedly punched him, hit him in the face with a dog chain, and deployed his K-9 unit to attack the plaintiff. *Vette*, 989 F.3d at 1172-73. The *Luethje* case involved allegations of officers sending a K-9 unit into the plaintiff's home, unsupervised, and allowing the K-9 unit to thrash the plaintiff's leg for approximately one minute while the officers questioned the plaintiff about who broke his window. *Luethje*, 131 F.4th at 1185-86. Here, as reflected in the body camera footage, Sgt. Burris utilized his K-9 unit to search for four male burglary suspects in the middle of the night, all four of whom had fled from the police into a residential area. Plaintiff had not been apprehended at the time Sgt. Burris utilized Edge in the search. Further, once Edge bit Plaintiff, the video footage reflects a brief struggle in a dark, tight space with tall grasses, during which time Sgt. Burris confirms that his back-up officer has control of Plaintiff's hands before he orders Edge to release Plaintiff. Accordingly, neither *Vette* nor *Luethje* support Plaintiff's argument that the unconstitutionality of Sgt. Burris's conduct was clearly established, and Sgt. Burris is thus entitled to qualified immunity.

15

## II.    Probable Cause

Sgt. Burris also asserts that he is entitled to qualified immunity with respect to Plaintiff's claim that Sgt. Burris did not have probable cause to detain Plaintiff. In response, although Plaintiff argues that probable cause was lacking, Plaintiff makes no attempt to show that the constitutional right allegedly violated by Sgt. Burris's conduct was clearly established at the time of the alleged violation. *See Rojas v. Anderson*, 727 F.3d 1000, 1004 (10th Cir. 2013) (quoting *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("'The plaintiff bears the burden of citing to [the Court] what he thinks constitutes clearly established law.'")); *see also Coulter v. Butler*, No. CIV-24-835-R, 2025 WL 1942415, at *3 (W.D. Okla. July 15, 2025) (granting qualified immunity where the plaintiff failed to lodge a meaningful response to the defendants' invocation of qualified immunity).

Further, "[p]robable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quotations and citation omitted). However, in the qualified immunity context, the Court "ascertain[s] whether a defendant violated clearly established law by asking whether there was *arguable* probable cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quotations and citation omitted, emphasis added). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher*, 759 F.3d at 1141. In other words, in the qualified immunity context, "law enforcement officials who

16

'reasonably but mistakenly conclude that probable cause is present' are entitled to qualified immunity." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007).

Even though Plaintiff did not address in any detail the arguable probable cause standard for qualified immunity purposes, the Court finds that, viewing the totality of the circumstances, Sgt. Burris had arguable probable cause to detain Plaintiff. As repeatedly set forth herein, Sgt. Burris was searching for four male individuals in the middle of the night, all of whom had fled on foot from the scene of a car burglary. It was thus reasonable for Sgt. Burris to conclude that he had probable cause to detain Plaintiff—Plaintiff matched the description of the individuals who had fled from the scene *and* was discovered hiding from the police, near the crime scene, at approximately 4:00 a.m. For these reasons, Sgt. Burris is also entitled to qualified immunity on Plaintiff's unlawful seizure claim.

## CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment [Doc. No. 47] is **GRANTED**.[6] A separate judgment shall be entered.

**IT IS SO ORDERED** this 17th day of July, 2026.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

---

[6] In light of this ruling, Plaintiff's Motion to Exclude the Testimony of Ken Wallentine Under *Daubert* [Doc. No. 46] is **DENIED** as **MOOT**.

17